SOUTH CAROLINA STATE HIGHWAY DEPARTMENT ET AL. *v.* BARNWELL BROTHERS, INC., ET AL.

No. 161. Argued January 4, 1938.—Decided February 14, 1938.

178

*Messrs. Steve C. Griffith* and *Thomas W. Davis,* with whom *Messrs. John M. Daniel,* Attorney General, *J. Ivey Humphrey* and *M. J. Hough,* Assistant Attorneys General, of South Carolina, *Eugene S. Blease, Douglas McKay, M. G. McDonald,* and *J. B. S. Lyles* were on the briefs, for appellants.

*Messrs. S. King Funkhouser* and *Frank Coleman,* with whom *Mr. J. Ninian Beall* was on the brief, for appellees.

By leave of Court, briefs of *amici curiae* were filed by *Mr. Otto Kerner,* Attorney General of Illinois; *Messrs. Hubert Meredith,* Attorney General, and *M. B. Holifield,* Assistant Attorney General, of Kentucky; *Messrs. William McCraw,* Attorney General, and *George P. Kirkpatrick,* Assistant Attorney General, of Texas, on behalf of their respective States, in support of appellants; by *Solicitor General Reed, Assistant Attorney General Jackson,* and *Mr. Elmer B. Collins,* on behalf of the United States, and by *Mr. Cary D. Landis,* Attorney General, on behalf of the State of Florida,—in support of appellees.

MR. JUSTICE STONE delivered the opinion of the Court.

Act No. 259 of the General Assembly of South Carolina, of April 28, 1933, 38 Stat. 340, prohibits use on the state highways of motor trucks and "semi-trailer motor trucks" whose width exceeds 90 inches, and whose weight including load exceeds 20,000 pounds. For purposes of the weight limitation § 2 of the statute provides that a semi-trailer motor truck, which is a motor propelled truck with a trailer whose front end is designed to be attached to and supported by the truck, shall be considered a single unit. The principal question for decision is whether these prohibitions impose an unconstitutional burden upon interstate commerce.

Appellees include the original plaintiffs below, who are truckers and interstate shippers; the Interstate Commerce Commission; and certain others who were permitted to intervene as parties plaintiff. The suit was brought in the district court for eastern South Carolina against various state officials, to enjoin them from enforcing §§ 4 and 6 of the Act among others,[1] on the ground that they have been superseded by the Federal Motor Carrier Act of 1935, c. 498, 49 Stat. 546; that they infringe the due process clause of the Fourteenth Amendment; and that they impose an unconstitutional burden on interstate commerce. Certain railroads interested in restricting the competition of interstate motor carriers were permitted to intervene as parties defendant.

The district court of three judges, after hearing evidence, ruled that the challenged provisions of the statute have not been superseded by the Federal Motor Carrier Act, and adopted as its own the ruling of the state Supreme Court in *State ex rel. Daniel* v. *John P. Nutt Co.,* 180 S. C. 19; 185 S. E. 25, that the challenged provisions, being an exercise of the state's power to regulate the use of its highways so as to protect them from injury and to insure their safe and economical use, do not violate the Fourteenth Amendment. But it held that the weight and width prohibitions place an unlawful burden on interstate motor traffic passing over specified highways of the state, which for the most part are of concrete or a concrete base surfaced with asphalt. It accordingly enjoined the enforcement of the weight provision against interstate motor carriers on the specified highways, and also

---

[1] "§ 4. Weight.—No person shall operate on any highway any motor truck or semi-trailer truck [sic] whose gross weight, including load, shall exceed 20,000 pounds.

"§ 6. Width.—No person shall operate on any highway any motor truck or semi-trailer motor truck whose total outside width, including any part of body or load, shall exceed 90 inches."

the width limitation of 90 inches, except in the case of vehicles exceeding 96 inches in width. It exempted from the operation of the decree, bridges on those highways "not constructed with sufficient strength to support the heavy trucks of modern traffic or too narrow to accommodate such traffic safely," provided the state highway department should place at each end of the bridge proper notices warning that the use of the bridge is forbidden by trucks exceeding the weight or width limits and provided the proper authorities take the necessary steps to enforce the law against such use of the bridges. The case comes here on appeal under § 266 of the Judicial Code.

The trial court rested its decision that the statute unreasonably burdens interstate commerce, upon findings, not assailed here, that there is a large amount of motor truck traffic passing interstate in the southeastern part of the United States, which would normally pass over the highways of South Carolina, but which will be barred from the state by the challenged restrictions if enforced, and upon its conclusion that, when viewed in the light of their effect upon interstate commerce, these restrictions are unreasonable.

To reach this conclusion the court weighed conflicting evidence and made its own determinations as to the weight and width of motor trucks commonly used in interstate traffic and the capacity of the specified highways of the state to accommodate such traffic without injury to them or danger to their users. It found that interstate carriage by motor trucks has become a national industry; that from 85 to 90% of the motor trucks used in interstate transportation are 96 inches wide and of a gross weight, when loaded, of more than ten tons; that only four other states prescribe a gross load weight as low as 20,000 pounds; and that the American Association of State Highway Officials and the National Conference on Street and Highway Safety in the Department of

Commerce have recommended for adoption weight and width limitations in which weight is limited to axle loads of 16,000 to 18,000 pounds and width is limited to 96 inches.

It found in detail that compliance with the weight and width limitations demanded by the South Carolina Act would seriously impede motor truck traffic passing to and through the state and increase its cost; that 2,417 miles of state highways, including most of those affected by the injunction, are of the standard construction of concrete or concrete base with asphalt surface, 7½ or 8 inches thick at the edges and 6 or 6½ inches thick at the center; that they are capable of sustaining without injury a wheel load of 8,000 to 9,000 pounds or an axle load of double those amounts, depending on whether the wheels are equipped with high pressure or low pressure pneumatic tires; that all but 100 miles of the specified highways are from 18 to 20 feet in width; that they constitute a connected system of highways which have been improved with the aid of federal money grants, as a part of a national system of highways; and that they constitute one of the best highway systems in the southeastern part of the United States.

It also found that the gross weight of vehicles is not a factor to be considered in the preservation of concrete highways, but that the appropriate factor to be considered is wheel or axle weight; the vehicles engaged in interstate commerce are so designed and the pressure of their weight is so distributed by their wheels and axles that gross loads of more than 20,000 pounds can be carried over concrete roads without damage to the surface; that a gross weight limitation of that amount, especially as applied to semi-trailer motor trucks, is unreasonable as a means of preserving the highways; that it has no reasonable relation to safety of the public using the highways; and that the width limitation of 90 inches is un-

reasonable when applied to standard concrete highways of the state, in view of the fact that all other states permit a width of 96 inches, which is the standard width of trucks engaged in interstate commerce.

In reaching these conclusions, and at the same time holding that the weight and width limitations do not infringe the Fourteenth Amendment, the court proceeded upon the assumption that the commerce clause imposes upon state regulations to secure the safe and economical use of highways a standard of reasonableness which is more exacting when applied to the interstate traffic than that required by the Fourteenth Amendment as to all traffic; that a standard of weight and width of motor vehicles which is an appropriate state regulation when applied to intrastate traffic may be prohibited because of its effect on interstate commerce, although the conditions attending the two classes of traffic with respect to safety and protection of the highways are the same.

South Carolina has built its highways and owns and maintains them. It has received from the federal government, in aid of its highway improvements, money grants which have been expended upon the highways to which the injunction applies. But appellees do not challenge here the ruling of the district court that Congress has not undertaken to regulate the weight and size of motor vehicles in interstate motor traffic, and has left undisturbed whatever authority in that regard the states have retained under the Constitution.

While the constitutional grant to Congress of power to regulate interstate commerce has been held to operate of its own force to curtail state power in some measure,[2]

---

[2] State regulations affecting interstate commerce, whose purpose or effect is to gain for those within the state an advantage at the expense of those without, or to burden those out of the state without any corresponding advantage to those within, have been thought to impinge upon the constitutional prohibition even though Congress

it did not forestall all state action affecting interstate commerce. Ever since *Willson* v. *Black Bird Creek Marsh Co.*, 2 Pet. 245, and *Cooley* v. *Board of Port Wardens*, 12 How. 299, it has been recognized that there are matters of local concern, the regulation of which unavoidably involves some regulation of interstate commerce but which, because of their local character and their number and diversity, may never be fully dealt with by Congress. Nothwithstanding the commerce clause, such regulation in the absence of Congressional action has for the most part been left to the states by the decisions of this Court, subject to the other applicable constitutional restraints.

The commerce clause, by its own force, prohibits discrimination against interstate commerce, whatever its form or method, and the decisions of this Court have recognized that there is scope for its like operation when state legislation nominally of local concern is in point of

has not acted. *Hall* v. *DeCuir*, 95 U. S. 485, 497–498; *Wabash, St. L. & P. R. Co.* v. *Illinois*, 118 U. S. 557, 575–578; *Bowman* v. *Chicago & N. W. R. Co.*, 125 U. S. 465, 498; *Western Union Telegraph Co.* v. *James*, 162 U. S. 650, 659, with which compare *Western Union Telegraph Co.* v. *Pendleton*, 122 U. S. 347, 358; *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1, with which compare *Geer* v. *Connecticut*, 161 U. S. 519, and *New York ex rel. Silz* v. *Hesterberg*, 211 U. S. 31; *Baldwin* v. *Seelig*, 294 U. S. 511, 524; see *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1, 27 *et seq.*

Underlying the stated rule has been the thought, often expressed in judicial opinion, that when the regulation is of such a character that its burden falls principally upon those without the state, legislative action is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state. See *Cooley* v. *Board of Port Wardens*, 12 How. 299, 315; *Gilman* v. *Philadelphia*, 3 Wall. 713, 731; *Escanaba Co.* v. *Chicago*, 107 U. S. 678, 683; *Lake Shore & M. S. R. Co.* v. *Ohio ex rel. Lawrence*, 173 U. S. 285, 294; cf. *Pound* v. *Turck*, 95 U. S. 459, 464; *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196, 205; *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, 499.

fact aimed at interstate commerce, or by its necessary operation is a means of gaining a local benefit by throwing the attendant burdens on those without the state. *Robbins* v. *Shelby County Taxing District,* 120 U. S. 489, 498; *Caldwell* v. *North Carolina,* 187 U. S. 622, 626.[3] It was to end these practices that the commerce clause was adopted. See *Gibbons* v. *Ogden,* 9 Wheat. 1, 187; *Brown* v. *Maryland,* 12 Wheat. 419, 438–439; *Cooley* v. *Board of Port Wardens, supra; State Freight Tax,* 15 Wall. 232, 280; *State Tax on Railway Gross Receipts,.* 15 Wall. 284, 289, 297–298; *Cook* v. *Pennsylvania,* 97 U. S. 566, 574; *Maine* v. *Grand Trunk R. Co.,* 142 U. S. 217; *Baldwin* v. *Seelig,* 294 U. S. 511, 522; II Farrand, Records of the Federal Convention, 308; III *id.* 478, 574, 548; The Federalist, No. XLII; 1 Curtis, History of the Constitution, 502; Story on the Constitution, § 259. The commerce clause has also been thought to set its own limitation upon state control of interstate rail carriers so as to preclude the subordination of the efficiency and convenience of interstate traffic to local service requirements.[4]

---

[3] Footnote 2, *supra.*

[4] See *Illinois Central R. Co.* v. *Illinois,* 163 U. S. 142; *Cleveland, C. C. & St. L. R. Co.* v. *Illinois,* 177 U. S. 514; *Mississippi Railroad Comm'n* v. *Illinois Central R. Co.,* 203 U. S. 335; *Atlantic Coast Line R. Co.* v. *Wharton,* 207 U. S. 328; *Herndon* v. *Chicago, R. I. & P. R. Co.,* 218 U. S. 135; *Chicago, B. & Q. R. Co.* v. *Railroad Commission,* 237 U. S. 220; *St. Louis & San Francisco R. Co.* v. *Public Service Comm'n,* 254 U. S. 535. Cf. *Gladson* v. *Minnesota,* 166 U. S. 427; *Lake Shore & M. S. R. Co.* v. *Ohio ex rel. Lawrence,* 173 U. S. 285; *Gulf, C. & S. F. R. Co.* v. *Texas,* 246 U. S. 58, where statutes requiring local service no greater than necessary for fair accommodation of local needs were held constitutional. Although the states have usually been allowed to impose burdens on interstate railroads in the interest of local safety, *Smith* v. *Alabama,* 124 U. S. 465; *Nashville, C. & St. L. R. Co.* v. *Alabama,* 128 U. S. 96; *New York, N. H. & H. R. Co.* v. *New York,* 165 U. S. 628; *Chicago, R. I. & P. R. Co.* v. *Arkansas,* 219 U. S. 453; *St. Louis, I. M. & S. R. Co.* v. *Arkansas,* 240 U. S. 518; cf. *Hennington* v. *Georgia,* 163 U. S. 299,

But the present case affords no occasion for saying that the bare possession of power by Congress to regulate the interstate traffic forces the states to conform to standards which Congress might, but has not adopted, or curtails their power to take measures to insure the safety and conservation of their highways which may be applied to like traffic moving intrastate. Few subjects of state regulation are so peculiarly of local concern as is the use of state highways. There are few, local regulation of which is so inseparable from a substantial effect on interstate commerce. Unlike the railroads, local highways are built, owned and maintained by the state or its municipal subdivisions. The state has a primary and immediate concern in their safe and economical administration. The present regulations, or any others of like purpose, if they are to accomplish their end, must be applied alike to interstate and intrastate traffic both moving in large volume over the highways. The fact that they affect alike shippers in interstate and intrastate commerce in large number within as well as without the state is a safeguard against their abuse.

From the beginning it has been recognized that a state can, if it sees fit, build and maintain its own highways, canals and railroads and that in the absence of Congressional action their regulation is peculiarly within its competence, even though interstate commerce is materially affected. *Minnesota Rate Cases,* 230 U. S. 352, 416. Congress not acting, state regulation of intrastate carriers has been upheld regardless of its effect upon interstate commerce. *Id.* With respect to the extent and nature of the local interests to be protected and the unavoidable effect upon interstate and intrastate commerce alike, regulations of the use of the highways are akin to

an unnecessarily harsh restriction, even though it is in the interest of safety, has been held to be unconstitutional. *Seaboard Air Line Ry.* v. *Blackwell,* 244 U. S. 310.

local regulation of rivers, harbors, piers and docks, quarantine regulations, and game laws, which, Congress not acting, have been sustained even though they materially interfere with interstate commerce.[5]

---

[5] Among the state regulations materially affecting interstate commerce which this Court has upheld, Congress not acting, are those which sanction obstructions in navigable rivers, *Willson* v. *Black-Bird Creek Marsh Co.,* 2 Pet. 245; *Ex parte McNiel,* 13 Wall. 236; *Pound* v. *Turck,* 95 U. S. 459; *Wilson* v. *McNamee,* 102 U. S. 572; *Huse* v. *Glover,* 119 U. S. 543; cf. *Sands* v. *Manistee River Improvement Co.,* 123 U. S. 288; approve the erection of bridges over navigable streams, *Gilman* v. *Philadelphia,* 3 Wall. 713; *Escanaba Co.* v. *Chicago,* 107 U. S. 678; *Cardwell* v. *American River Bridge Co.,* 113 U. S. 205; *Willamette Iron Bridge Co.* v. *Hatch,* 125 U. S. 1; *Lake Shore & M. S. R. Co.* v. *Ohio,* 165 U. S. 365; require payment of fees as an incident to use of harbors, *Cooley* v. *Board of Port Wardens,* 12 How. 299; *Steamship Co.* v. *Joliffe,* 2 Wall. 450; *Anderson* v. *Pacific Coast S. S. Co.,* 225 U. S. 187; *Clyde Mallory Lines* v. *Alabama ex rel. State Docks Comm'n,* 296 U. S. 261; cf. *Mobile County* v. *Kimball,* 102 U. S. 691; control the location of docks, *Cummings* v. *Chicago,* 188 U. S. 410; impose wharfage charges, *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Packet Co.* v. *Catlettsburg,* 105 U. S. 559; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691; *Ouachita Packet Co.* v. *Aiken,* 121 U. S. 444; establish inspection and quarantine laws, *Turner* v. *Maryland,* 107 U. S. 38; *Morgan's S. S. Co.* v. *Louisiana Board of Health,* 118 U. S. 455; *Patapsco Guano Co.* v. *North Carolina Board of Agriculture,* 171 U. S. 345; *Rasmussen* v. *Idaho,* 181. U. S. 198; *Smith* v. *St. Louis & S. W. R. Co.,* 181 U. S. 248; *Reid* v. *Colorado,* 187 U. S. 137; *New Mexico ex rel. McLean & Co.* v. *Denver & R. G. R. Co.,* 203 U. S. 38; *Asbell* v. *Kansas,* 209 U. S. 251; *Red "C" Oil Mfg. Co.* v. *Board of Agriculture,* 222 U. S. 380; *Savage* v. *Jones,* 225 U. S. 501; *Pure Oil Co.* v. *Minnesota,* 248 U. S. 158; *Mintz* v. *Baldwin,* 289 U. S. 346; cf. *Railroad Co. v. Husen,* 95 U. S. 465; *Minnesota* v. *Barber,* 136 U. S. 313; *Brimmer* v. *Rebman,* 138 U. S. 78; and regulate the taking or exportation of domestic game, *Geer* v. *Connecticut,* 161 U. S. 519; *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31; cf. *Foster-Fountain Packing Co. v. Haydel,* 278 U. S. 1, 13, holding invalid a local regulation ostensibly designed to conserve a natural resource but whose purpose and effect were to benefit Louisiana enterprise at the expense of businesses outside the state.

The nature of the authority of the state over its own highways has often been pointed out by this Court. It may not, under the guise of regulation, discriminate against interstate commerce. But "In the absence of national legislation especially covering the subject of interstate commerce, the State may rightly prescribe uniform regulations adapted to promote safety upon its highways and the conservation of their use, applicable alike to vehicles moving in interstate commerce and those of its own citizens." *Morris* v. *Duby*, 274 U. S. 135, 143. This formulation has been repeatedly affirmed, *Clark* v. *Poor*, 274 U. S. 554, 557; *Sprout* v. *South Bend*, 277 U. S. 163, 169; *Sproles* v. *Binford*, 286 U. S. 374, 389, 390; cf. *Morf* v. *Bingaman*, 298 U. S. 407, and never disapproved. This Court has often sustained the exercise of that power although it has burdened or impeded interstate commerce. It has upheld weight limitations lower than those presently imposed, applied alike to motor traffic moving interstate and intrastate. *Morris* v. *Duby, supra; Sproles* v. *Binford, supra.* Restrictions favoring passenger traffic over the carriage of interstate merchandise by truck have been similarly sustained, *Sproles* v. *Binford, supra; Bradley* v. *Public Utilities Comm'n,* 289 U. S. 92, as has the exaction of a reasonable fee for the use of the highways. *Hendrick* v. *Maryland,* 235 U. S. 610; *Kane* v. *New Jersey,* 242 U. S. 160; *Interstate Busses Corp.* v. *Blodgett,* 276 U. S. 245; *Morf* v. *Bingaman, supra;* cf. *Ingels* v. *Morf,* 300 U. S. 290.

In each of these cases regulation involves a burden on interstate commerce. But so long as the state action does not discriminate, the burden is one which the Constitution permits because it is an inseparable incident of the exercise of a legislative authority, which, under the Constitution, has been left to the states.

Congress, in the exercise of its plenary power to regulate interstate commerce, may determine whether the

burdens imposed on it by state regulation, otherwise permissible, are too great, and may, by legislation designed to secure uniformity or in other respects to protect the national interest in the commerce, curtail to some extent the state's regulatory power. But that is a legislative, not a judicial function, to be performed in the light of the Congressional judgment of what is appropriate regulation of interstate commerce, and the extent to which, in that field, state power and local interests should be required to yield to the national authority and interest. In the absence of such legislation the judicial function, under the commerce clause as well as the Fourteenth Amendment, stops with the inquiry whether the state legislature in adopting regulations such as the present has acted within its province, and whether the means of regulation chosen are reasonably adapted to the end sought. *Sproles* v. *Binford, supra; Stephenson* v. *Binford,* 287 U. S. 251, 272.

Here the first inquiry has already been resolved by our decisions that a state may impose non-discriminatory restrictions with respect to the character of motor vehicles moving in interstate commerce as a safety measure and as a means of securing the economical use of its highways. In resolving the second, courts do not sit as legislatures, either state or national. They cannot act as Congress does when, after weighing all the conflicting interests, state and national, it determines when and how much the state regulatory power shall yield to the larger interests of a national commerce. And in reviewing a state highway regulation where Congress has not acted, a court is not called upon, as are state legislatures, to determine what, in its judgment, is the most suitable restriction to be applied of those that are possible, or to choose that one which in its opinion is best adapted to all the diverse interests affected. *Transportation Co.* v. *Parkersburg,* 107 U. S. 691, 695. When the action of a legislature is

within the scope of its power, fairly debatable questions as to its reasonableness, wisdom and propriety are not for the determination of courts, but for the legislative body, on which rests the duty and responsibility of decision. *Jacobson* v. *Massachusetts,* 197 U. S. 11, 30; *Laurel Hill Cemetery* v. *San Francisco,* 216 U. S. 358, 365; *Price* v. *Illinois,* 238 U. S. 446, 451; *Hadacheck* v. *Sebastian,* 239 U. S. 394, 408–414; *Thomas Cusack Co.* v. *Chicago,* 242 U. S. 526, 530; *Euclid* v. *Ambler Realty Co.,* 272 U. S. 365, 388; *Zahn* v. *Board of Public Works,* 274 U. S. 325, 328; *Standard Oil Co.* v. *Marysville,* 279 U. S. 582, 584. This is equally the case when the legislative power is one which may legitimately place an incidental burden on interstate commerce. It is not any the less a legislative power committed to the states because it affects interstate commerce, and courts are not any the more entitled, because interstate commerce is affected, to substitute their own for the legislative judgment. *Morris* v. *Duby, supra,* 143; *Sproles* v. *Binford, supra,* 389, 390; *Minnesota Rate Cases, supra,* 399, 400; *Smith* v. *St. Louis & S. W. R. Co.,* 181 U. S. 248, 257; *Reid* v. *Colorado,* 187 U. S. 137, 152; *New York ex rel. Silz* v. *Hesterberg,* 211 U. S. 31, 42, 43.

Since the adoption of one weight or width regulation, rather than another, is a legislative not a judicial choice, its constitutionality is not to be determined by weighing in the judicial scales the merits of the legislative choice and rejecting it if the weight of evidence presented in court appears to favor a different standard. Cf. *Worcester County Trust Co.* v. *Riley,* 302 U. S. 292, 299. Being a legislative judgment it is presumed to be supported by facts known to the legislature unless facts judicially known or proved preclude that possibility. Hence, in reviewing the present determination we examine the record, not to see whether the findings of the court below are supported by evidence, but to ascertain upon the whole

record whether it is possible to say that the legislative choice is without rational basis. *Standard Oil Co.* v. *Marysville, supra; Borden's Farm Products Co.* v. *Ten Eyck,* 297 U. S. 251, 263; s. c. 11 F. Supp. 599, 600. Not only does the record fail to exclude that possibility, but it shows affirmatively that there is adequate support for the legislative judgment.

At the outset it should be noted that underlying much of the controversy is the relative merit of a gross weight limitation as against an axle or wheel weight limitation. While there is evidence that weight stresses on concrete roads are determined by wheel rather than gross load weights, other elements enter into choice of the type of weight limitation. There is testimony to show that the axle or wheel weight limitation is the more easily enforced through resort to weighing devices adapted to ascertaining readily the axle or wheel weight. But it appears that in practice the weight of truck loads is not evenly distributed over axles and wheels; that commonly the larger part of the load—sometimes as much as 70 to 80%—rests on the rear axle and that it is much easier for those who load trucks to make certain that they have complied with a gross load weight limitation than with an axle or wheel weight limitation. While the report of the National Conference on State and Highway Safety, on which the court below relied, suggested a wheel weight limitation of 8,000 or 9,000 pounds, it also suggested that a gross weight limitation might be adopted and should be subject to the recommended wheel limitation. But the conference declined to fix the amount of gross weight limitation, saying: "In view of the varying conditions of traffic, and lack of uniformity in highway construction in the several States, no uniform gross-weight limitations are here recommended for general adoption throughout the country." The choice of a weight limitation based on convenience of application and consequent lack of

need for rigid supervisory enforcement is for the legislature, and we cannot say that its preference for the one over the other is in any sense arbitrary or unreasonable. The choice is not to be condemned because the legislature prefers a workable standard, less likely to be violated than another under which the violations will probably be increased but more easily detected. It is for the legislature to say whether the one test or the other will in practical operation better protect the highways from the risk of excessive loads.

If gross load weight is adopted as the test it is obvious that the permissible load must be somewhat lighter than if the axle or wheel weight test were applied. With the latter the gross weight of a loaded motor truck can never exceed twice the axle and four times the wheel limit. But the fact that the rear axle may and often does support as much as 70 or 80% of the gross load, with wheel weight in like proportion, requires that a gross load limit be fixed at considerably less than four times the permissible wheel limit.

There was testimony before the court to support its conclusion that the highways in question are capable of sustaining without injury a wheel load of 8,000 or 9,000 pounds, the difference depending upon the character of the tire in use, as against a wheel load of as much as 8,000 pounds, which would be possible under the statutory load limit of 20,000 pounds as applied to motor trucks, and approximates the axle limit in addition to the gross load limit recommended by the National Conference on Street and Highway Safety. Much of this testimony appears to have been based on theoretical strength of concrete highways laid under ideal conditions, and none of it was based on an actual study of the highways of South Carolina or of the subgrade and other road building conditions which prevail there and which have a material bearing on the strength and durability of such highways. There is

uncontradicted testimony that approximately 60% of the South Carolina standard paved highways in question were built without a longitudinal center joint which has since become standard practice, the portion of the concrete surface adjacent to the joint being strengthened by reinforcement or by increasing its thickness; and that owing to the distribution of the stresses on concrete roads when in use, those without a center joint have a tendency to develop irregular longitudinal cracks. As the concrete in the center of such roads is thinner than that at the edges, the result is that the highway is split into two irregular segments, each with a weak inner edge which, according to the expert testimony, is not capable of supporting indefinitely wheel loads in excess of 4,200 pounds.

There is little in the record to mark any controlling distinction between the application of the gross load weight limitation to the motor truck and to the semi-trailer motor truck. There is testimony which is applicable to both types of vehicle, that in case of accident the danger from the momentum of a colliding vehicle increases with gross load weight. The record is without convincing evidence of the actual distribution, in practice, of the gross load weight over the wheels and axles of the permissible types of semi-trailer motor trucks, but this does not enable us to say that the legislature was without substantial ground for concluding that the relative advantages of a gross load over a wheel weight limitation are substantially the same for the two types, or that it could not have concluded that they were so nearly alike for regulatory purposes as to justify the adoption of a single standard for both, as a matter of practical convenience. Even if the legislature were to accept appellees' assumption that net load weights are, in practice, evenly distributed over the wheels supporting the load of a permissible semi-trailer so that with the statutory gross

load limit the load on the rear axle would be about 8,000 pounds it might, as we have seen, also conclude that the danger point would then have been reached in the case of some 1,200 miles of concrete state roads constructed without a center joint.

These considerations, with the presumption of constitutionality, afford adequate support for the weight limitation without reference to other items of the testimony tending to support it. Furthermore, South Carolina's own experience is not to be ignored. Before adoption of the limitation South Carolina had had experience with higher weight limits. In 1924 it had adopted a combined gross weight limit of 20,000 pounds for vehicles of four wheels or less, and an axle weight limit of 15,000 pounds. In 1930 it had adopted a combined gross weight limit of 12½ tons with a five ton axle weight limit for vehicles having more than two axles. Act No. 721, 33 Stat. 1182; Act No. 685, 36 Stat. 1192, 1193. In 1931 it appointed a commission to investigate motor transportation in the state, to recommend legislation, and to report in 1932. The present weight limitation was recommended by the commission after a full consideration of relevant data, including a report by the state engineer who had constructed the concrete highways of the state and who advised a somewhat lower limitation as necessary for their preservation. The fact that many states have adopted a different standard is not persuasive. The conditions under which highways must be built in the several states, their construction and the demands made upon them, are not uniform. The road building art, as the record shows, is far from having attained a scientific certainty and precision, and scientific precision is not the criterion for the exercise of the constitutional regulatory power of the states. *Sproles* v. *Binford, supra,* 388. The legislature, being free to exercise its own judgment, is not bound by that of other legislatures. It would hardly be contended

that if all the states had adopted a single standard none, in the light of its own experience and in the exercise of its judgment upon all the complex elements which enter into the problem, could change it.

Only a word need be said as to the width limitation. While a large part of the highways in question are from 18 to 20 feet in width, approximately 100 miles are only 16 feet wide. On all the use of a 96 inch truck leaves but a narrow margin for passing. On the road 16 feet wide it leaves none. The 90 inch limitation has been in force in South Carolina since 1920 and the concrete highways which it has built appear to be adapted to vehicles of that width. The record shows without contradiction that the use of heavy loaded trucks on the highways tends to force other traffic off the concrete surface onto the shoulders of the road adjoining its edges and to increase repair costs materially. It appears also that as the width of trucks is increased it obstructs the view of the highway, causing much inconvenience and increased hazard in its use. It plainly cannot be said that the width of trucks used on the highways in South Carolina is unrelated to their safety and cost of maintenance, or that a 90 inch width limitation adopted to safeguard the highways of the State, is not within the range of the permissible legislative choice.

The regulatory measures taken by South Carolina are within its legislative power. They do not infringe the Fourteenth Amendment, and the resulting burden on interstate commerce is not forbidden.

*Reversed.*

MR. JUSTICE CARDOZO and MR. JUSTICE REED took no part in the consideration or decision of this case.