WASHINGTON STATE BUILDING & CONSTRUCTION TRADES COUNCIL AFL–CIO, a Washington Corporation and Labor Organization; Washington Voice of Energy, a Nonprofit Washington Corporation; U. S. Ecology, Inc., a California Corporation; Tri-City Nuclear Industrial Council, a Nonprofit Washington Corporation; Tri-State Motor Transit Co., a Delaware Corporation; Precision Castparts Corporation, an Oregon Corporation; Northern States Power Company, a Minnesota Corporation; and Chem-Nuclear Systems, Inc., a Washington Corporation, Plaintiffs,

v.

The Honorable John C. SPELLMAN, Governor of the State of Washington; the Honorable Kenneth Eikenberry, Attorney General of the State of Washington; and Alan J. Gibbs, Secretary of the State of Washington, Department of Social and Health Services, Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF WASHINGTON, John C. Spellman, Governor of the State of Washington, and Kenneth O. Eikenberry, Attorney General of the State of Washington, Defendants.

Nos. C–81–154 RJM, C–81–190 RJM.

United States District Court,
E. D. Washington.

June 26, 1981.

Michael B. Crutcher, Robert L. Gunter, Preston, Thorgrimson, Ellis & Holman, Seattle, Wash., for Washington State Bldg. & Const. Trades Council.

Kenneth O. Eikenberry, Kenneth MacIntosh, Michael Hanbey, Asst. Attys. Gen., Seattle, Wash., for State of Wash., John C. Spellman, et al.

Thomas S. Martin, Acting Asst. Atty. Gen., Dennis G. Linder, Branch Director, Brook Hedge, Asst. Branch Director, Paul Gaukler, Thomas Millet, Attorneys, Dept. of Justice, Washington, D. C., for United States.

## MEMORANDUM DECISION

ROBERT J. McNICHOLS, Chief Judge.

The plaintiffs in these cases challenge the constitutionality of Washington's Radioactive Waste Storage and Transportation Act

of 1980, adopted by the voters as Initiative Measure No. 383 (Initiative). Since the plaintiffs' motions for summary judgment rest on substantially similar grounds, their motions were joined for purposes of argument.

One of the plaintiffs, U.S. Ecology, Inc. operates one of the three active commercial nuclear waste disposal sites in the United States. It provides disposal services to the United States, various state governments and numerous commercial users throughout the country. The United States, in addition to being a substantial user of the commercial facility, also maintains its own disposal sites in Washington.

The defendant (State) by the Initiative, seeks to effectively ban the storage of all non-medical radioactive waste (waste) generated outside the State of Washington. The Initiative also bans the transportation of such waste to any storage site in Washington. The stated purpose of the Initiative was to protect the health and safety of the citizens of Washington. Although the State contends that the provision in the Initiative for an interstate compact might remove any impermissible ban on interstate commerce, the Initiative Compact Section does not provide a timely or effective exception to the ban.

The Initiative does not ban the transportation for storage or the storage of waste generated in Washington. Nor does it ban the transportation of radioactive material through Washington for use or storage elsewhere. Consequently, the Initiative suggests that the perceived harms caused by the waste occur after its disposal in the storage sites.

The plaintiffs jointly contend that the Initiative violates the Commerce Clause, U.S.Const., Art. I, § 8, cl. 3 and that under the Supremacy Clause, U.S.Const., Art. VI, cl. 2, it has been preempted by federal law. (Atomic Energy Act, 42 U.S.C. §§ 2011 et seq.; Low-Level Radioactive Waste Policy Act, Pub.L.No. 96–573 (Dec. 23, 1980); Hazardous Materials Transportation Act, 49 U.S.C. §§ 1801 et seq.). In addition, the United States contends that the Initiative violates the War Powers and Property Clauses of the United States Constitution. With respect to the Commerce Clause, the State contends that the Initiative is valid as an action of a market participant or as a proper exercise of the State's police powers. With respect to the Supremacy Clause, the State contends that the Initiative has not been preempted by federal law. I hold that the Initiative is unconstitutional and thus not enforceable.

## FACTS

This controversy centers on the transportation to and storage of nuclear waste on the Hanford Reservation. This federal reservation consists of 562 square miles of land and facilities in and around Benton County, Washington. Since 1943, the reservation has been used for federal nuclear programs.

There are three storage areas on the reservation. The first two areas are owned and operated by the federal government. The first area provides storage for waste generated from federal energy programs and national defense activities. The second area contains a near-surface test facility which is designed to test the feasibility of storing spent fuel and high-level waste in underground basalt formations. The third area arose out of a lease of approximately 1000 acres by the United States to the State of Washington. The State of Washington subleased approximately 100 of those acres to U.S. Ecology, Inc. for the operation of a low-level radioactive waste storage facility. Although there are two other active commercial facilities in the United States, the U.S. Ecology, Inc. site is the only existing commercial facility which can store absorbed low-level radioactive liquids.

The commercial site is licensed for its current activity by the State of Washington. The site is regulated under State and Federal regulations pertaining to atomic energy and health and environmental protection. The United States Department of Transportation regulates the transportation of the radioactive waste.

The low-level radioactive waste problem is of national concern. S.Rep.No. 548, 96th Cong. (1980), *reprinted in* U.S.Code Cong. & Ad.News 11230. The latest Department of Energy statistics indicate commercial facilities generated over three million cubic feet of low-level waste in 1980. Low-Level Radioactive Waste Management Report (Draft Report, April 21, 1981). By 1985, the figure is expected to increase to over five and a half million cubic feet per year. *Id.*

The commercial storage facility on the Hanford Reservation is a key facility in the nation's waste disposal program. Specifically, it is the only commercial storage site which can store "absorbed low-level radioactive liquids." Moreover, it accepted approximately twenty-seven percent (27%) of the total waste in 1980. While a site in Barnwell, South Carolina has been accepting more than fifty percent (50%) of the generated waste, a South Carolina "volume limitation program" will cut that site's capacity to less than twenty-five percent (25%) of the waste generated in 1985.

The facts of this case present a classic supply and demand problem. It is clear that there is a serious national problem with the increasing volume of waste, which must be stored somewhere, and a nearly simultaneous reduction of the already limited storage capacity. Congress has recognized this problem and taken steps to solve it to the end that a few states will not continue to bear the waste of many. If the Initiative were permitted to stand it would aggravate an already critical situation.

## DISCUSSION

The Initiative is invalid for two reasons: it violates the Supremacy Clause and the Commerce Clause of the United States Constitution.

■ The Initiative violates the Supremacy Clause because it seeks to regulate legitimate federal activity, and because it has been preempted by federal law.

If the Initiative seeks to regulate the transportation for storage and storage of all federal waste generated outside the State of Washington and the operation of the federal storage facilities, the Initiative violates the Supremacy Clause. U.S.Const., Art. VI, cl. 2. Since defendants' counsel are unable to represent that the Initiative did not apply against the federal government, I must, in light of the Initiative's clear language, assume that it does purport to apply to the federal government. Therefore, I am compelled to find that, to the extent that it is applicable to the United States government, the Initiative, in the absence of an express Congressional waiver of sovereignty, is unconstitutional. *Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Mayo v. United States*, 319 U.S. 441, 63 S.Ct. 1137, 87 L.Ed. 1504 (1943).

The doctrine of federal preemption has its roots in the Supremacy Clause. The issue is whether the federal government has preempted the state regulation of high-level and low-level radioactive wastes.

Since preemption may be demonstrated in either of two ways, my function is to determine: (1) Whether there is evidence (pervasive federal scheme or dominant federal interest) that Congress intended to supersede the police powers of the State, *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947) or (2) Whether the Initiative "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 58 L.Ed. 581 (1941).

By reviewing the pervasive federal statutory schemes for the regulation of radioactive waste, the Atomic Energy Act, the Low-Level Radioactive Waste Policy Act and the Hazardous Materials Transportation Act, and applying established judicial reasoning, I am convinced that Congress intended that the transportation and storage of all materials which pose radiation hazards would be regulated by the federal government except where jurisdiction was expressly ceded to the states. *Northern States Power Company v. State of Minnesota*, 447 F.2d 1143 (CA8 1971), *aff'd*, 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972)

(nuclear waste releases); *Consolidated Rail Corporation v. City of Dover*, 450 F.Supp. 966 (D.Del.1978) (hazardous freight and toxic materials).

The State concedes, and the most recent legislative history confirms the fact that Congress has not expressly ceded management of high-level radioactive waste. S.Rep.No. 548, 96th Cong. (1980), *reprinted in* U.S.Code Cong. & Ad.News 11231. Since it is clear that federal law preempts any state ban on high-level waste, the only remaining issue is whether Congress has expressly ceded regulation of low-level wastes.

In this case, there are two federal expressions which might be interpreted as a grant of such authority: (1) the Agreement between the United States Atomic Energy Commission and the State of Washington pursuant to Section 274 of the Atomic Energy Act (42 U.S.C. § 2021), and (2) the Low-Level Radioactive Waste Policy Act, Pub.L.No. 96–573 (Dec. 23, 1980).

Although the Section 274 Agreement expressly ceded qualified regulatory responsibility over byproduct materials, source materials and special nuclear materials, it did not cede control over all low-level wastes. Also, the Agreement, by its terms, contemplates "that State and Commission programs for protection against hazards of radiation will be coordinated and compatible." Agreement at p. 2. Moreover, the Agreement recognizes the desirability of reciprocal recognition of licenses. Agreement at p. 5. Furthermore, Congress granted the authority to regulate certain nuclear material. It did not grant the authority to effectively ban the receipt and disposal of such material. Finally, the Initiative was expressly based upon the State's police power to protect the health, safety and welfare of the citizens of Washington State. It was not premised on the Section 274 Agreement.

Thus, neither the Agreement nor the statute which authorized it represent an express grant of the authority to the State to effectively ban the storage or transport of low-level radioactive waste.

The Low-Level Waste Policy Act, (Low-Level Act), does constitute a valid but limited grant of authority to effectively ban the storage of certain waste. The Low-Level Act is important for several reasons. First, it clearly excludes federal waste or facilities from any action taken under a regional compact.

Second, the Low-Level Act recognizes the particularly acute national problem of a high demand for storage and a dwindling supply of storage capacity. At the same time, the Act recognizes that those states (Nevada, South Carolina and Washington) which provide the nation's entire commercial disposal system cannot be expected to continue to bear the burden of the other states' waste problems.

Thirdly, the Low-Level Act presents a rational and equitable approach for resolving the waste disposal problem. Each state is now responsible "for providing for the availability of capacity either within or outside the State" for low-level radioactive waste disposal. Section 4(a)(1)(A). The Low-Level Act recognizes that a regional approach affords the safest and most efficient management. Section 4(a)(1)(B). Congress has authorized the states to join interstate compacts to provide for regional disposal sites. Section 4(a)(2)(A). These compacts are subject to approval by Congress. After January 1, 1986, any such regional *compact* may preclude disposal of extra-regional waste in the *compact's* regional sites. Section 4(a)(2)(B).

The State's argument that Congress, by this statute, ceded complete authority to regulate is not persuasive because the statute merely makes each state "responsible for providing for the availability of capacity."

The State contends that the Federal Low-Level Waste Act does not preclude the State from presently banning the importation of waste. Such an interpretation of the statute is strained. Congress has authorized the State to enter into interstate compacts. After such compacts are approved by Congress, the regions established thereby may exclude waste from without

the region after January 1, 1986 *or* at such other times as Congress may authorize.

A close reading of the statute and the legislative history reveals a Congressional plan to place future responsibility on the individual states to dispose of their waste. To encourage individual state action, Congress made it clear to all states that if they did not make provision for their own waste by January 1, 1986, they could be denied access to other regions' disposal sites. At the same time, Congress recognized that the organization of regional compacts and construction of disposal sites would take time. Consequently, Congress expressly delayed any authorized ban on radioactive waste until January 1, 1986. If I were to adopt the contentions that Washington may ban waste today, the State of Washington would obstruct the efforts of Congress toward an orderly resolution of a significant national problem.

For the aforementioned reasons, the Initiative cannot withstand scrutiny under the Supremacy Clause.

### COMMERCE CLAUSE

The plaintiffs contend that the Initiative violates the Commerce Clause, U.S.Const., Art. I, § 8, cl. 3, because it discriminates against and interferes with interstate commerce. The State contends that the Initiative does not violate the Commerce Clause because: (1) the interstate movement of radioactive waste, unlike other substances, is not "commerce" within the meaning of the Commerce Clause; (2) the state is acting as a market participant; and (3) the Initiative is based upon a permissible exercise of the state's police powers.

■ Both a common sense view of the facts and the principle that "[a]ll objects of interstate trade merit Commerce Clause protection; none [are] excluded by definition at the outset[,]" *Philadelphia v. New Jersey*, 437 U.S. 617, 622, 98 S.Ct. 2531, 2534, 57 L.Ed.2d 475 (1978), (solid or liquid waste), support a determination that the movement of radioactive waste in interstate commerce fits within the definition of "commerce" for constitutional purposes.

■ The State's contention that the Initiative merely reflects the action of a "market participant" and that as such the Initiative is beyond the reach of the Commerce Clause is not persuasive. The Initiative is not a proprietary measure. The clear language of the Initiative establishes that it is a regulatory measure. It purports to effectively ban the transport for storage and the storage of certain material. It establishes civil and criminal penalties for violations. Moreover, the Initiative is based on a perceived need to protect the health and safety of the citizens of Washington. It is not based on economics or other factors traditionally associated with proprietary measures. Finally, the State, as a lessor, is engaged in the rental business. The real proprietors are the United States government as an operator of two federal sites and U.S. Ecology, Inc., as the operator of the commercial site. Having determined that the movement of radioactive waste is "commerce" and that the State is not a "market participant", I must now determine whether the Initiative is permissible as an exercise of Washington's police powers. I hold that the State of Washington, through the Initiative, has exceeded its police powers.

■ Unlike the situation in *South Carolina State Highway Department v. Barnwell Brothers, Inc.*, 303 U.S. 177, 58 S.Ct. 510, 82 L.Ed. 734 (1938), Congress has established a pervasive statutory scheme, in this case, to regulate nuclear activity. Although Congress has ceded some of this authority to the states, it has not granted the states the power to effectively ban the transportation for storage or the storage of radioactive waste generated outside Washington. In the presence of such pervasive federal legislation, the Initiative must be invalidated. *Campbell v. Hussey*, 368 U.S. 297, 82 S.Ct. 327, 7 L.Ed.2d 299 (1961) (supplemental state tobacco regulation).

Even in the absence of federal legislation, "the Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce." *Raymond Motor*

*Transportation, Inc. v. Rice*, 434 U.S. 429, 440, 98 S.Ct. 787, 793, 54 L.Ed.2d 664 (1978). However, a state statute which affects commerce does not violate the Commerce Clause if it is designed to serve a legitimate state interest and if it is applied in a nondiscriminatory manner. *Id.* The court in such instances must make a "delicate adjustment of the conflicting state and federal claims." *Great Atlantic & Pacific Tea Co., Inc. v. Cottrell*, 424 U.S. 366, 371, 96 S.Ct. 923, 928, 47 L.Ed.2d 55 (1976), *quoting from H. P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 553, 69 S.Ct. 657, 679, 93 L.Ed. 865 (Black, J., dissenting). The traditional criteria for this "delicate adjustment" are set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174.

The *Pike* test centers on three key issues: (1) As a threshold issue, does the state law regulate evenhandedly; (2) Does the state law effectuate a legitimate local public purpose; and (3) Does it have only an incidental effect on interstate commerce. Assuming these questions are answered in the affirmative, "the Initiative will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits...." *Id.* This balancing effort involves "a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." *Raymond Motor Transportation, Inc. v. Rice, supra*, 434 U.S. at 441, 98 S.Ct. at 794.

The threshold issue must be answered in the negative. Where, as here, a state "overtly blocks the flow of interstate commerce at [the] State's borders," *Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), the state statute on its face discriminates against interstate commerce on the basis of origin. Such facial discrimination, regardless of the State's purpose, may by itself provide a sufficient basis to invalidate the statute. *Id.* Moreover, in light of the Initiative's implied exemptions and the recent decision in *Kassel v. Consolidated Freightways Corporation of Delaware*, —— U.S. ——, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981), it is also clear that an application of the Initiative to the movement of radioactive waste in interstate commerce would discriminate against commerce. The exemptions in the Initiative, particularly the implied exemption of all radioactive waste generated in Washington, offers the benefits of available radioactive waste storage to Washington's nuclear industry and effectively denies such benefits to the bulk of this country's nuclear industry. Moreover, since the Initiative impliedly exempts the shipment of radioactive waste through the State and, by its terms, is directed at the origin of the waste, it would appear that the State has decided that the principal harm from radioactive waste arises after its disposal in a storage site. Thus, there is no basis to distinguish waste generated in Washington from waste generated in other states. In short, the Initiative on its face and in its plain effect is unconstitutional because it does not regulate evenhandedly. *See Kassel v. Consolidated Freightways, supra; Philadelphia v. New Jersey, supra.*

Even if such facial and substantive discrimination is not a per se fatal defect, "such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 441 U.S. 322, 337, 99 S.Ct. 1727, 1737, 60 L.Ed.2d 250 (1979). The Initiative cannot withstand such scrutiny.

While it has been held that "if safety justifications are not illusory, the Court will not second-guess legislative judgment," *Raymond Motor Transportation, Inc. v. Rice, supra* 434 U.S. at 449, 98 S.Ct. at 798 (Blackmun, J., concurring), the mere incantation of "a purpose to promote the public health or safety does not insulate a state law from Commerce Clause attack." *Kassel v. Consolidated Freightways*, —— U.S. ——, ——, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580 (1981). This should be particularly true where, as here, the state law is a product of the Initiative process and not a product of the more detailed and deliberate approach normally associated with the state legislature.

Moreover, when discrimination against commerce is demonstrated, the State has the burden of demonstrating the local benefits flowing from the state statute and the unavailability of adequate nondiscriminatory alternatives. *Hunt v. Washington Apple Advertising Comm'n.*, 432 U.S. 333, 353, 97 S.Ct. 2434, 2446, 53 L.Ed.2d 383 (1977). Here the defendants have failed to present evidence that non-medical radioactive waste, transported and stored in compliance with Federal regulations, is dangerous to the health and safety of the citizens of the State of Washington. Indeed, a recent study by the Department of Social and Health Services of the State of Washington suggests that nuclear waste, if properly regulated, can be safely transported and also suggests that there are less discriminatory means to protect the public. See Stipulation of Authenticity of Documents, Exhibit 10. The closing sentence of the report's Abstract is particularly instructive:

> None of our studies detected serious personnel exposure problems, but further reductions can be obtained through the institution of better storage procedures, quicker handling techniques and maintaining greater distances from radiation sources.

Finally, the Initiative will clearly have more than an incidental effect on interstate commerce. As noted earlier, Congress and the Department of Energy have noted the rapid growth of radioactive waste and the reduction in storage capacity. The Initiative will aggravate this national problem by substantially reducing all low-level radioactive waste storage and by precluding any commercial storage of absorbed low-level radioactive liquids.

Even if I were to consider the weight and nature of the state regulatory concern in light of the extent of the burden on interstate commerce, I would still hold that the Initiative violates the Commerce Clause. Since the State's safety interest, assuming proper compliance with adequate regulations, is at least arguably illusory and since the Initiative significantly impairs the federal interest in encouraging the peaceful use of radioactive material and in solving the radioactive waste problem, the Initiative cannot be harmonized with the Commerce Clause.

### CONCLUSION

For the aforementioned reasons, I hold that the Initiative is unconstitutional and thus unenforceable. Therefore, plaintiffs' Motions for Summary Judgment are GRANTED. The Clerk shall enter judgment accordingly.

IT IS SO ORDERED.